**Affirmed and Opinion Filed December 23, 2022**



In The

# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-20-01114-CV

**MARK HOLLOWAY, Appellant**
**V.**
**DALLAS COUNTY HOSPITAL DISTRICT D/B/A PARKLAND HEALTH AND HOSPITAL SYSTEM, Appellee**

**On Appeal from the 44th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-14-00792**

## MEMORANDUM OPINION

Before Justices Myers and Nowell[1]
Opinion by Justice Myers

Appellant/plaintiff Mark Holloway filed this Texas Labor Code Chapter 21

Texas Commission on Human Rights Act (TCRHA) suit for damages against

appellee/defendant Dallas County Hospital District d/b/a Parkland Health and

Hospital System (Parkland), alleging discrimination because of race and retaliation

against him for opposing discriminatory practices. Parkland filed a combined plea

to the jurisdiction and traditional and no-evidence summary judgment motion. This

---

[1] Justice Leslie Osborne was a member of the panel and participated in the oral argument of this appeal. After argument, she resigned from this Court. Justice Osborne did not participate in the decision of this case. TEX. R. APP. P. 41.1(b).

is an appeal from the trial court's order granting appellee's combined plea to the jurisdiction and summary judgment motion and dismissing plaintiff's claims with prejudice. In one issue, Holloway argues the trial court erred in granting the plea to the jurisdiction and summary judgment motion because Holloway's evidence raised a fact issue on all elements of his race discrimination and retaliation claims, and he exhausted his administrative remedies. We affirm.

## BACKGROUND AND PROCEDURAL HISTORY

### I. Introduction

Parkland operates the Dallas County public hospital, often referred to as Parkland Memorial Hospital. Holloway worked for Parkland in various positions from March 1988 to October 1, 2003, the last one being Network Engineer II. Holloway's Parkland employment ended in October 2003 when Holloway and other IT personnel were outsourced to contractor Perot Systems. Holloway was employed by Perot Systems from 2003 to 2008, and he became employed by ACS when it won the Parkland contract. ACS was subsequently purchased by Xerox Business Services, LLC, or "Xerox." At all times relevant to this lawsuit, Holloway was employed by Xerox and assigned to the Parkland account as a contract Network Engineer.

### II. Parkland's Hiring and Recruiting Practices

According to Gilliam Williams, a female African American job recruiter with Parkland's IT division for four years, Parkland used PeopleSoft recruiting software

in 2012 and 2013. Job applicants at Parkland, including former Parkland employees like Holloway, were required to submit an online employment application to be considered for a position. According to Parkland's Human Resources Procedure Manual, "[n]either Parkland . . . nor any of its supervisors have any obligation to notify employees when jobs for which they might qualify are posted." Parkland's job recruiters reviewed applications in PeopleSoft and evaluated each applicant based on (a) whether they had the minimum education or credential requirements of the job description for the position, and (b) any additional criteria the hiring manager requested (such as experience with certain software) that were not in the minimum requirements for the job description. According to Williams' declaration, hiring managers at Parkland had no access to applications submitted in PeopleSoft or knowledge of the identity of applicants, "other than those applicants whom I chose to route to the hiring manager for consideration." Parkland encouraged recruiters to fill open positions quickly, within the parameters of Parkland's posting and hiring policies. After the recruiter routed an applicant through PeopleSoft, the hiring manager responded whether they wanted to interview the routed applicant. If the hiring manager decided to select the applicant for hire, the recruiter would verify that the position had been posted internally on the PeopleSoft job opening page for a minimum of seven (7) calendar days, in compliance with Parkland's policy on job postings, prior to moving forward with a conditional offer.

Williams stated in her declaration that when evaluating candidates for IT

–3–

positions, she found that on-the-job experience and technical certifications held by an applicant were a better predictor of an applicant's skill set than a college degree. She added that college degrees indicated an applicant had "broad-based" but not necessarily specialized knowledge in the IT field. She stated that where a job description allowed for equivalent combination of education and/or experience, she would consider routing applicants who had (1) years of specific experience relevant to the position in question, and (2) technical certifications that were a minimum requirement for the position, but who did not hold a college degree—even where a degree was a minimum requirement for the position. If a job description included a technical certification as a minimum requirement, Williams did not consider routing the resume of an applicant who did not hold the certification in question because she found it "difficult or impossible to tell from the experience or education listed on a resume" whether the applicant had skills that were "truly equivalent to a technical certification, which measures an applicant's *level* of technical proficiency in specific IT disciplines."

### III. Jobs 133462 and 133607: Senior Network Engineer

Williams was the Parkland recruiter who conveyed Bobby Black's application for the Senior Network Engineer position in Job 133462, and the application from Lee Newman for the Senior Network Engineer position in Job 133607—the two positions on which Holloway bases his discriminatory failure to hire claim. Job 133462, Senior Network Engineer, opened on October 22, 2012, and was filled on

December 5, 2012. Bobby Black, according to his declaration, applied for it after learning of the position through PeopleSoft. Holloway did not apply for the position. He said he was going to apply for the position "the next day," but the job posting was "off the board." Black stated in his declaration that Parkland hiring manager Robert Saine "did not personally telephone me or otherwise reach out to inform me that the Senior Network Engineer position was posted in PeopleSoft."

According to her declaration, Williams routed Bobby Black's application to Saine for consideration because (1) Black held not only a CCNA ("Cisco Certified Network Associate)," the minimum requirement for the Senior Network Engineer position, but a CCNP (or "Cisco Certified Network Professional"), which was a "more advanced" certification than a CCNA;[2] and (2) Black was already working onsite at Parkland as a contract Network Engineer, which indicated to Williams he had the necessary knowledge and experience for the position. "To the best of [her] recollection," Saine did not ask Williams to prioritize routing any applicant for job 133462 to him for consideration. Saine, who interviewed Black, testified that he and Newman were identified to him as people "we'd like to interview."

Before issuing a conditional offer to Black, Williams verified (according to her declaration) that as of November 9, 2012, the job had been posted for eighteen days, more than the minimum of seven calendar days required by Parkland's policy

---

[2] In the job description, a CCNP certification was listed as a preferred certification.

on the posting of job openings. Williams also stated that once an applicant accepted a conditional offer of employment through PeopleSoft, all other applicants were placed in a "hold" status, but the position remained open in PeopleSoft—and additional applicants could apply—until the position was filled and removed from PeopleSoft. Black accepted a conditional offer of employment from Parkland on November 20, 2012, and a formal job offer was made to him on December 4, 2012, after he completed the drug test and background screening requirements. The position was filled the following day, December 5, 2012. Altogether, job 133462 was open for a total of 44 days from the initial posting on October 22 until December 5, 2012, during which time Holloway could have applied for it, and did not.

Job 133607, Senior Network Engineer, opened on November 1, 2012, and was filled on December 5, 2012. Lee Newman stated in his declaration that he applied for the position through PeopleSoft; Parkland recruiter Williams contacted him to set up an interview; and Saine interviewed him for the position. Holloway, again, did not apply for the position. As noted before, however, he stated in his deposition that he was going to apply for it "the next day," but the job posting had been taken "off the board."

Williams stated that she routed Newman's application to Saine for consideration because Newman had a CCNA certification, and he was already working onsite at Parkland as a contract Network Engineer, which indicated to her he had the necessary knowledge and experience for the position. Saine, who

–6–

interviewed Newman, testified that Newman was identified as someone "we'd like to interview." According to Williams, she verified, before issuing a conditional offer to Newman, that as of November 9, 2012, the job had been posted for nine days, more than the minimum seven calendar days required by Parkland's job openings policy. Newman accepted Parkland's conditional offer of employment on November 19, 2012, and Williams made a formal offer to him (according again to her declaration) on December 4, 2012, after Newman completed the drug test and background screening requirements. The position was filled the following day, on December 5, 2012. The position remained open for a total of 34 days from the initial posting on November 1 until December 5, 2012, during which time Holloway could have applied for it, and, again, did not.

Williams stated that she did not know Holloway and had not heard of him in 2012 and 2013, apart from reviewing resumes he submitted. She also said that prior to January 2014, when she was asked to provide documents to Parkland's investigators, she was not aware Holloway had made complaints of discrimination against Parkland; she had no knowledge of an investigation by the Dallas County Hospital District Police Department in December 2012 (see part IV, infra), or whether Holloway participated in it; and she had no knowledge of Holloway's filing of a charge of discrimination with the EEOC. Williams additionally stated that, "[t]o the best of my knowledge," she "complied with Parkland policy and my regular recruiting practices" with respect to the positions for which Holloway applied. And

Williams stated that even if Holloway had applied for jobs 133462 and/or 133607, she would have routed his application to Saine only if Holloway had a CCNA certification—a requirement for the position of Senior Network Engineer—listed on his resume. Saine testified that he formed the belief Holloway would not be a "good fit" for the position of Senior Network Engineer because he lacked the technical skills required for the position (e.g., his inability to configure switches, or even some of the simpler switch configurations, much less the complex designs being installed at the new Parkland Hospital).

## IV. Parkland's Internal Investigations

After Black and Newman were hired, Holloway visited Parkland's "Employment Experience" office on November 26, 2012. Holloway explained that he was a former Parkland employee whom Parkland had previously outsourced. The investigative notes indicate Holloway complained that Bob Black and Lee Newman, neither of whom, according to Holloway, had ever worked for Parkland, had been hired from Xerox instead of him. Holloway added that he "wasn't treated the same."

In an unrelated matter, in December 2012 Sergeant Robert Johnson, Sr., of Parkland's police department was asked to investigate a complaint brought by another Parkland IT employee (Israel Benitez) that concerned (according to Johnson's report) "an alleged culture of intimidation, harassment, and racial bias/favoritism exhibited by employees and leadership" in Parkland's IT department. The investigation also looked into "any alleged criminal behavior."

Johnson interviewed multiple employees in the Parkland IT department as part of his investigation, including Holloway. Holloway reported his concerns that Alan Greenslade, Parkland's Chief Technology Officer, and Saine had "demonstrated discriminatory hiring practices;" Greenslade and Saine had sought to include only Caucasian or non-African American individuals to fill positions; and Parkland (through Greenslade and Saine) had not hired Holloway because he was African American. Johnson's report, dated December 20, 2012, identified Holloway as a witness in his investigation and stated that "[s]ome employees complained of racial bias[ ] when it came to hiring, promoting, or assignments," including "current Parkland [e]mploy[ees] seeking promotion and current contract employ[ees] seeking full[-]time employment with Parkland." Sergeant Johnson's report concluded in part:

> In looking at the command structure of the IT Department, I too noticed a disparity in minority and women representation. I saw no evidence of this being a discriminatory hiring practice, however, the perception [of] most of the IT team is that it is. I was advised by several team members of the "good ole boy" mentality. This is referring to a group of white males at the top who have often personal relationships with each other and will not allow people of color or women to be promoted. Again, I saw no evidence of this, but the perception some employees have is real.

A January 2, 2013 memorandum from Parkland's Director of Employment Experience & Leadership & Organizational Development, Kurt Delabar, referred to Johnson's investigation and various information provided to him—an indication Delabar was aware of the report's contents. During that same month, Delabar shared

portions of the Parkland police department's investigation with Alan Greenslade, the individual responsible for managing Xerox's performance on the contract, and Xerox's Strategic Business Unit Manager Brian McDonald, who oversaw the contractual and business relationship between Xerox and Parkland. Both attested in their declarations, however, that they were unaware of Holloway's participation in the police investigation.

### V. Other Positions

Holloway applied for other jobs with Parkland. In January 2013, he was rejected by Parkland for a Senior Systems Engineer position (Job 133822). According to the job description, a CCNA certification was not required for this position. Holloway also applied for an Application System Analyst/Programmer-Senior position (Job 135301) in April 2013, but in May Parkland canceled the position without hiring anyone because, according to the declaration of Leah Partier, a Parkland job recruiter, Parkland determined that filling an office manager position was a more urgent hiring need. In addition, Holloway applied—and was rejected—for positions with Parkland for Materials Information Systems Electronic Data Interchange Coordinator (Job 134799), Systems Engineer (Job 135849), Senior System Engineer (Job 135544), and Applications System Analyst/Programmer-Senior (Job 135087), none of which required CCNA certification. However, the postings for jobs 134799 and 135849 were canceled and none of the applicants were hired. Holloway's applications for jobs 135544 and 135087 were pending at the

time of his dismissal from Xerox in August 2013 (see part VII, infra), and other applicants were subsequently hired.

## VI. Holloway's Work on the Parkland Account

Brian McDonald was responsible for discussing with Parkland any problems regarding the performance of Xerox's network engineers, including Holloway. He testified that in 2010 Alan Greenslade threatened to terminate the data network services portion of the contract because he didn't think he was getting value for the money he was paying for the network engineering services. Xerox and Parkland subsequently executed an amendment to their contract (amendment 18) specifying that as of October 1, 2010, Xerox would be required to provide Parkland with two Network Engineers with "CCNA resources (or equivalent experience)."

Starting in 2011, however, Parkland began to complain to Xerox about the performance of certain Xerox Network Engineers, including Holloway, and about certain network incidents or outages in which Holloway was involved. At some point after the Parkland contract was executed, Greenslade informed McDonald that Xerox's network engineers were not providing a level of service that justified the fees Parkland was paying under the contract or that was required by the complexity of Parkland's network. Greenslade notified McDonald that, going forward, Parkland expected the Network Engineers assigned to the Parkland account to be, at a minimum, CCNA-certified. Xerox Network Engineer Team Leader Bobby Black, who was later hired by Parkland, recalled informing (between 2009 and 2010) the

other Xerox Network Engineers including Holloway, Jamie Fletcher, and Lee Newman, that obtaining their CCNA certification was required by Xerox to remain on the Parkland account. In response to this communication, Fletcher and Newman took and passed the CCNA exam, and Black renewed his CCNP certification. By December 2012, when Black left Xerox to work for Parkland, Holloway was the only Xerox Network Engineer who did not have a CCNA.

Holloway told Black he did not believe a CCNA certification was necessary for him because he was working on his bachelor's degree. Prior to the 2010 amendment to the Parkland contract, McDonald and Greenslade had determined that Holloway had CCNA or equivalent experience. But they later concluded Holloway was not performing at a level that was "consistent with what we wanted to have at a CCNA or equivalent."

McDonald, however, continued to receive complaints from Greenslade about Holloway. In February 2013, Holloway's Xerox co-worker, Fletcher, complained to John Clark, Holloway's supervisor, in an email about Holloway's attitude toward his Xerox co-workers, and a January 4, 2013 incident at the DeHario Clinic where a circuit was down for four days because Holloway failed to properly troubleshoot the problem. Fletcher's email also referenced a prior outage at the Dallas County Youth Jail Facilities that occurred in November 2011. Although Holloway was not personally responsible for that outage, he was criticized, according to the post-mortem incident report, for not ensuring everyone was "on the same page" before

leaving the job site and returning to the hospital for additional equipment. Xerox Network Engineer Robert Mercer, who worked with Holloway on that project, was faulted for disregarding Holloway's specific instructions. Mercer, a white male, was later removed from the Parkland account at Greenslade's request because of this incident (according to McDonald's declaration), and his Xerox employment terminated.

Clark subsequently placed Holloway on a performance review plan. Holloway's February 27, 2013 "performance improvement review" (PIR) form, his first disciplinary action, listed three deficiencies: (1) "CCNA certification has not been achieved"; (2) "Poor planning and lack of follow through on projects"; and (3) "You have shown disrespect and an attitude of irritation to your colleagues." Clark sent a draft copy of the PIR to McDonald. According to his deposition, McDonald did not recall ever showing Greenslade the performance review plan, but he "very likely would have captured the highlights of it" with him.

Holloway was given until March 29, 2013 (approximately six weeks), to complete the CCNA certification exam and remedy his performance and attitude issues, but the PIR form stated that the expectations set forth would remain in effect for the duration of Holloway's Xerox employment. If he did not complete the CCNA and improve on his performance issues by March 29, or if any of those issues recurred after that date, Holloway's Xerox employment could be terminated. Clark testified that his goal in putting Holloway on a performance plan was to improve his

performance because Clark wanted him to remain employed by Xerox. McDonald reviewed the substance of the plan with Greenslade prior to discussing it with Holloway because, according to McDonald, complaints regarding Holloway's performance had by then reached Greenslade's attention. As McDonald testified, he was trying to reassure Greenslade that Xerox was addressing its concerns regarding Holloway. According to Clark, no one at Parkland asked him to implement the PIR plan for Holloway.

On March 9, 2013, Holloway filed his first Equal Employment Opportunity Commission (EEOC) charge with the Texas Workforce Commission, which alleged in part:

> I, a black male employee of respondent between 1988 and 2008, and then since 2008, a contract employee of respondent jointly employed by respondent and Xerox Corporation, performing the duties of the position of network engineer within respondent's IT division, have been denied reemployment by respondent, unlike other three white male contract employees of respondent jointly employed by respondent and Xerox Corporation and then employed by respondent in 2013, in addition to other similarly situated white male contract employees likewise jointly employed by respondent and Xerox Corporation and then employed by respondent prior to 2013.

Parkland hired outside counsel to investigate, and to respond to the EEOC. In that spring of 2013, Greenslade told an investigator for Parkland (conducting an independent investigation into Holloway's allegation, at Parkland's request) that:

> Mr. Holloway is in the Xerox network team. In 2003 he was an employee of Parkland on the networking team. He and his team were outsourced to Perot. In 2007, they began to bring pieces of IT back to Parkland. The application team, Epic team, and Cerner (lab and pharmacy), imaging, and financials were brought back.

–14–

ACS won the contract and was purchased by Xerox. They hired Mr. Holloway. The network team has stayed outsourced. We did hire two engineers to work on the new hospital. We posted the positions. Two individuals working for Xerox (Bob Black and Lee Newman) applied for and obtained the positions. Mr. Holloway was not qualified, nor did he apply, for the positions. Xerox has been working with Mr. Holloway to get him a certification, CCNA (Cisco Certified Network Associate). He has not gotten it. Recently, Xerox has been having difficulty with him because he has developed a bad attitude.

During this same time, Holloway continued working for Xerox and was assigned to Parkland, and he received some emails from various individuals thanking him for his work at Parkland—either individually or as part of a team. On April 1, 2013, Fletcher emailed Clark that "Mark is maintaining a better attitude. His overall performance is much improved," to which Clark replied: "Thanks, we are now at the end of the PIR time frame. I will be meeting with Mark tomorrow. I will let him know that the PIR is over but any repeat of past performance will not be tolerated." Fletcher responded, "Sounds good. Hopefully this is all that was needed to get him back on track."

Greenslade, however, who oversaw the Xerox contract, had weekly meetings with Xerox during this time, and he continued to complain to McDonald during the spring and summer of 2013 about network incidents or outages in which Holloway was involved. He did not make any written complaints to McDonald regarding Holloway. McDonald, the "point person" on the account for Parkland staff, likewise did not recall receiving any written complaints from Parkland regarding Holloway in between Holloway's first PIR in February 2013, and his eventual removal from

–15–

the Parkland account in August of that same year. Clark testified that he did not communicate with Parkland staff directly; he went through McDonald.

Xerox, additionally, continued to inquire about whether Holloway had obtained his CCNA. On May 9, 2013, McDonald emailed Clark noting that he had met with Parkland's Lee McChesney (the manager of network and telecommunication) the day before "and he had no new issues[,] nor did I have anything new to report to him regarding . . . Holloway's attitude or performance," but "Lee did ask about [Holloway's] progress on his CCNA certification." McDonald asked "[h]ow is that going[,] and do we have a date for the exam or anything else that's pertinent to attaining that certification?" Four days later, on May 13, Clark emailed Holloway that he needed "a firm commitment on a real date" by which Holloway would obtain the certification. Clark reminded Holloway that the contract with Parkland required two CCNA and two CCNP engineers, and that "[w]e needed to show the client we are making true efforts in meeting this goal."

On June 18, 2013, Holloway filed an amended EEOC charge alleging the following retaliatory conduct by Parkland: (1) "In April 2013, a disciplinary action against me"; (2) "In late March and early April 2013, false criticism of my projects and tasks." The following day, on June 19, Holloway was interviewed by Parkland's investigators. During that interview, which was transcribed, Holloway told his side of the story, stating (among other things) that he had applied for over twenty jobs at Parkland (including network engineer) and never received an interview; Greenslade

hired only white males; there was no "level field" at Parkland because the certification requirement did not apply to everyone. Two days later, on June 21, 2013, Clark emailed Holloway that he would be removed from the Parkland account unless he got the CCNA by the end of August: "I just want to be crystal clear here. If you do not get the CCNA by the end of August we will need to remove you from the site. We (Xerox) must comply with the contract."

On July 10, 2013, approximately five months after the original deadline, Xerox issued a second PIR stating that the CCNA certification had not been obtained, and giving Holloway until August 31, 2013, to do so. That same day, Clark met with Holloway to "review the addendum to the PIR original[ly] presented to [Holloway] on February 27, 2013. The addendum was added to formalize the due date for completing the CCNA. Mark continues to deny he was told the CCNA was a requirement even after being told it was a requirement in the February PIR." The meeting notes included the following notation: "I let Mark know that the CCNA was still in effect and the date of completion was now August 31st 2013."

On the same day the July 10 PIR issued, Fletcher emailed Clark and McDonald regarding a new performance issue involving Holloway where he was unable to configure a switch on a "simple" connection at the Medlock facility. According to Fletcher, it was "an example of [Holloway's] lack of technical ability." A couple of weeks later, on July 25, 2013, Fletcher reported to Clark and McDonald regarding an incident during a network outage at the Amelia Court location. Fletcher

–17–

and Holloway were troubleshooting the problem with Lee McChesney, and Fletcher asked Holloway to open a service request to Cisco (called a TAC). Holloway was unable to open the service request, and he left the room for approximately thirty minutes—Fletcher assumed he had gone outside to smoke a cigarette. When he returned, McChesney and Fletcher asked him where he had gone and why he did not open the service request. Holloway replied that he was unable to open the service request. According to Fletcher's email, McChesney said this was unacceptable and he should not stop working simply because he could not open the service request; he should have called Cisco directly. In his deposition, Holloway acknowledged that he could have opened the service request by calling Cisco, which is how Fletcher ultimately solved the problem.

On August 15, 2013, McDonald emailed Clark as follows:

Last week when the three of us met, Jamie and I left the meeting with the impression that Mark Holloway would cease supporting Parkland by the end of this week. As the customer has escalated 2 incidents to my attention in as many weeks (another one this week), I've communicated expectations that this was going to be addressed by Friday. Can you please let us know what's going on so that we can address the client's concerns and also ensure that Jamie can plan for site coverage if it's just him and Brian this weekend?

The following day, August 16, Clark emailed McDonald that he had "been going back and forth with HR," that he believed he had "the correct contact now and will be talking to them today," and he would let McDonald know the result. Three days later, on August 19, 2013, McDonald emailed Clark: "Based on recent performance and feedback from customer, the SBU [Strategic Business Unit] would like to

remove Mark Holloway from supporting Parkland."[3]

On August 21, 2013, ten days before the deadline for Holloway to obtain his CCNA certification, Clark told him he had to leave the Parkland campus. According to Holloway, Clark told him during a conference call that Parkland wanted him "off the account." Clark testified that he made the decision to remove Holloway from the site (at the recommendation of McDonald) based on the Medlock and Amelia Court incidents, which had been reported to him by Fletcher. Clark said he did not know what the feedback was from the customer at that point; however, he knew that Fletcher, a Xerox employee, had told him after Holloway's last performance review on July 10 that he could not configure a switch and that he had failed to open a service request.

McDonald said in his declaration that he did "not recall" Greenslade, McChesney, or Fernando Martinez, a Parkland chief technology officer, "directing, requiring, or requesting" that he put Holloway on a PIR plan, remove him from the Parkland account, or terminate his Xerox employment. And Clark testified that the information technology executives at Parkland would not have gone through him— they would have contacted McDonald. However, Clark testified that regardless of

---

[3] In his affidavit, McDonald stated he did "not recall having personal knowledge of an [EEOC] charge of discrimination brought by Mr. Holloway against Parkland at the time of my August 19, 2013 request to Clark that Mr. Holloway be removed from the Parkland account." Clark testified that he was unaware of Holloway's race prior to him filing an EEOC charge against Xerox. And Greenslade similarly stated in his affidavit that when he expressed concerns to McDonald in the Spring and Summer of 2013 about network incidents or outages in which Holloway was involved, he was not aware Holloway had filed a charge of discrimination against Parkland with the EEOC.

whether anyone at Parkland asked McDonald to remove Holloway from the Parkland account, Clark already knew it needed to be done because Holloway was not providing CCNA or equivalent service and because he was not complying with the performance improvement process.

McDonald said that his August 19, 2013 request to Clark that Holloway be removed from the Parkland account was based on "an accumulation of things," including (1) information provided by Fletcher regarding Holloway's performance deficiencies; (2) the report made to him by Parkland's McChesney about Holloway's performance deficiencies during the Amelia Court network outage; (3) Holloway's Xerox disciplinary history; and (4) Holloway's performance deficiencies dating back to 2011. McDonald also stated that, based on his years of experience as a Xerox manager and Holloway's Xerox disciplinary history, he did not need any input from Parkland to decide that removing Holloway from the Parkland account was necessary because (1) his performance in late 2012 and 2013 showed he did not have technical abilities equivalent to a CCNA-certified engineer, and (2) Holloway was not providing the level of service expected by Xerox.[4]

## VII. Termination of Holloway's Employment with Xerox

Holloway was still employed by Xerox after his removal from the Parkland account. Holloway acknowledged in his deposition that Parkland did not have the

---

[4] Although Parkland was not aware of it at the time, Holloway took and failed the CCNA exam on August 17, 2013, a few days before his removal from the Parkland account.

authority to fire Xerox employees, only request their removal from the account. They would no longer be assigned to the Parkland account but remained employed by Xerox. Holloway also acknowledged that he never talked to anyone at Xerox about being reassigned to a different account, nor did he know if they could have done so.

Xerox, however, was discussing terminating Holloway's employment before his removal from Parkland due to his alleged performance issues. On August 19, 2013, two days before Holloway was removed from the Parkland account, Clark emailed his supervisor, Joseph Kimball, regarding an "Employee Issue." The email reads in part:

> I have an employee Mark Holloway, he is one of the onsite engineers at Parkland. Over the past months we have had issue with his performance. To make a long story short the SBU is now requesting we remove him from the site. I sent all of this to HR and they are waiting on a note from me requesting his termination. Before I did this, I wanted to make sure you were aware and were ok with the decision. I have lots of history on this and will send it to you if you would like.

> PS. Just want to make sure you know all the details. Mark was employed at Parkland before we (ACS) took over the site. I believe Mark is already suing Parkland because they didn't hire him and I believe he will sue Xerox if we terminate him.

Clark stated that he was "looking for a place for [Holloway] to be" after his removal from the Parkland account. Clark thought Holloway's lack of a CCNA certification would have limited the client accounts to which he could have been assigned. But any interest Xerox might have had in identifying new assignments for Holloway— or in continuing his employment—ended after he sent Fernando Martinez, the Chief

–21–

Information Officer of Parkland, the following email on August 22, 2013 complaining about his removal from the Parkland account:

I was ask by XEROX (John Clark and Jamie Fletcher) to leave the Parkland Hospital campus today at 10:30 AM, because of performance issues something I did not know anything about until now. They told me Parkland wanted me off the campus until further notice. I'm not aware of any performance issues all my work are done on time and have no complaints from none of the Parkland staff or UTSW staff, I was told by XEROX until they work this out with Parkland I can't not come back on campus and they will call me or setup another meeting with me tomorrow. I have never been so embarrass in my life and never see people lie on you just so they can get employment at Parkland like these people that come from XEROX, Joe Juarez of Parkland went though the same thing until he got his job back at Parkland. When I arrived at work on 08-20-2013 at 9:00 AM Brian Mcdonald, Jamie Fletcher, Dungan William of XEROX and Parkland Manager Lee McChesney of Parkland Hospital was interviewing one of Dungan William friends for a job in the Networking Dept. later I found out they are trying to hire two of William friends . I was not included or aware of any interviewing process or have any input on any of the candidates. There is no diversity in that area and I was very surprise to be ask to leave the campus over people in that area making false issues about me not doing my job. Jamie Fletcher have lie on me over and over again for personal gain. I have worked at Parkland for over 20 yrs and never being wrote up for anything, I would like to see if I could setup a meeting with you about the unfair treatment that I have went through down in that area.

Clark believed this email—sent from Holloway's personal email—was inappropriate. But Clark admitted in his deposition that it merely sped up the decision to terminate Holloway's employment, which, as Clark acknowledged, would have happened anyway because there were no other positions available for him after his removal from the Parkland account. Clark forwarded the email to Joseph Kimball, who sent it to Joan Brancheau, the director of human resources. After conferring, they agreed Holloway's employment should be terminated, and this was done seven days later, on August 29, 2013.

## VIII. Procedural History

In January 2014, Holloway filed suit against Parkland under Chapter 21 of the

Texas Labor Code, alleging retaliatory termination and a discriminatory failure to hire claim against Parkland, pursuant to the Texas Labor Code. Parkland filed a plea to the jurisdiction and traditional and no-evidence motions for summary judgment in November 2019, to which Holloway replied with a combined response in opposition. Parkland filed a reply in support of its plea and evidentiary objections to plaintiff's combined response. Holloway filed a response to Parkland's evidentiary objections, and Parkland filed a reply in support of them. On December 1, 2020, the trial court signed an order granting Parkland's plea to the jurisdiction and motions for summary judgment and entering "judgment against Plaintiff as a matter of law," dismissing his claims with prejudice. The court's order states that it relied on the briefing including Parkland's evidentiary objections, evidence submitted by the parties, and the arguments by counsel. This appeal followed.

## DISCUSSION

### I. Issue Raised

Holloway brings the following issue:

The trial court erred in granting Parkland's plea to the jurisdiction and motions for summary judgment in their entirety and dismissing all of Holloway's claims, because Holloway's evidence raised a fact issue on all elements of his race discrimination and retaliation claims, and he exhausted his administrative remedies

### II. Standard of Review

"Sovereign immunity deprives a trial court of jurisdiction over lawsuits in which the state or certain governmental units have been sued, unless the state

–23–

consents to suit." *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 636 (Tex. 2012). "As a result, immunity is properly asserted in a plea to the jurisdiction." *Id*. The standard of review of an order denying a plea to the jurisdiction based on governmental immunity is de novo. *Tex. Nat. Res. Conservation Comm'n. v. IT Davy*, 74 S.W.3d 849, 855 (Tex. 2002).

While a plea to the jurisdiction typically challenges "whether the plaintiff has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the case," a plea to the jurisdiction "can also "properly challenge the *existence* of those very jurisdictional facts." *Garcia*, 372 S.W.3d at 635. "In those cases, the court can consider evidence as necessary to resolve any dispute over those facts, even if that evidence 'implicates both the subject-matter jurisdiction of the court and the merits of the case.'" *Id*. (quoting *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004)).

Parkland's Plea challenged the existence of jurisdictional facts with supporting evidence. "In such cases, the standard of review mirrors that of a traditional summary judgment." *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 771 (Tex. 2018). "'[I]f the plaintiffs' factual allegations are challenged with supporting evidence necessary to consideration of the plea to the jurisdiction, to avoid dismissal plaintiffs must raise at least a genuine issue of material fact to overcome the challenge to the trial court's subject matter jurisdiction.'" *Id*. (quoting *Miranda*, 133 S.W.3d at 221). "In determining whether a material fact issue exists,

we must take as true all evidence favorable to the plaintiff, indulging every reasonable inference and resolving any doubts in the plaintiff's favor." *Id.* "In doing so, however, we cannot disregard evidence necessary to show context, and we cannot disregard evidence and inferences unfavorable to the plaintiff if reasonable jurors could not." *Id.*

The TCHRA prohibits employers[5] from discriminating against protected employees or retaliating against employees who engage in protected activities. *See* TEX. LAB. CODE §§ 21.051, 21.055. An employee engages in a protected activity by, among other things, opposing a discriminatory practice, making or filing a charge of discrimination with the EEOC or TWC, or participating in an investigation by the EEOC or TWC. *Id.* § 21.055. The TCHRA waives a governmental employer's immunity from suit for violations under the act. *Alamo Heights*, 544 S.W.3d at 770. Because the TCHRA was modeled after federal statutes, Texas courts look to relevant federal precedent for guidance. *Tex. Dep't of Transp. v. Lara*, 625 S.W.3d 46, 52 (Tex. 2021) (citing *Garcia*, 372 S.W.3d at 634).

In the context of a TCRHA claim brought pursuant to Chapter 21 of the Texas Labor Code, the Supreme Court of Texas has stated that "[a]ll elements of a TCHRA circumstantial-evidence claim are . . . jurisdictional." *Alamo*, 544 S.W.3d at 783,

---

[5] The TCHRA expressly defines "employer" to include "a county, municipality, state agency, or state instrumentality. . ." TEX. LAB. CODE §21.002(8)(D). Public hospital districts like Parkland are state instrumentalities and subject to claims under the Texas Labor Code. *See Tarrant County Hosp. Dist. v. Henry*, 52 S.W.3d 434, 445-48 (Tex. App.—Fort Worth 2001, no pet.), *abrogated on other grounds as recognized by Harris Cty. Hosp. Dist. v. Tomball Regional Hosp.*, 283 S.W.3d 838, 843 (Tex. 2009).

784. "[W]hen jurisdictional evidence negates the prima facie case or . . . rebuts the presumption it affords, some evidence raising a fact issue . . . is required to survive a jurisdictional plea." *Id*. at 764. The Texas Supreme Court has "explained that '[l]ike a failure of proof at the prima facie stage, a failure to prove the elements of a TCHRA claim [even] after a trial on the merits deprives the trial court of jurisdiction.'" *Id*. at 784 (quoting *San Antonio Water Sys. v. Nicholas*, 461 S.W.3d 131, 136 (Tex. 2015)).

The TCHRA prohibits an employer from failing or refusing to hire or discharging an individual "because of race, color, disability, religion, sex, national origin, or age." TEX. LAB. CODE § 21.051(1). The TCHRA also waives governmental immunity from suit, but only if the plaintiff alleges facts that would establish a violation of the TCHRA "and, when challenged with contrary evidence, provides evidence that is at least sufficient to create a genuine fact issue material to that allegation." *Tex. Tech Univ. Health Sciences Ctr.–El Paso v. Flores*, 612 S.W.3d 299, 305 (Tex. 2020).

A plaintiff can establish discrimination under the TCHRA in two ways. *See Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476–77 (Tex. 2001); *City of Richland Hills v. Childress*, No. 02-20-00334-CV, 2021 WL 4205013, at *4 (Tex. App.—Fort Worth Sept. 16, 2021, pet. denied) (mem. op.). First, the employee can offer direct evidence of the employer's discriminatory actions or words. *Id*. at 476. "'Direct evidence of discrimination is evidence that, if believed, proves the fact of

–26–

discriminatory animus without inference or presumption.'" *Coll. of the Mainland v. Glove*r, 436 S.W.3d 384, 392 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (quoting *Jespersen v. Sweetwater Ranch Apartments*, 390 S.W.3d 644, 653 (Tex. App.—Dallas 2012, no pet.)). Two, because direct evidence of discrimination or retaliation is a "rarity" in employment cases, courts allow claims to proceed with indirect or circumstantial evidence of discrimination or retaliation. *Russo v. Smith Int'l, Inc.*, 93 S.W.3d 428, 434 (Tex. App.—Houston [14th Dist.] 2002, pet. denied). Under this second method, which applies here, Texas courts follow the burden-shifting mechanism set forth by the United States Supreme Court in *McDonnell Douglas*.[6] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973); *Glover*, 436 S.W.3d at 392.

The Texas Supreme Court describes the three-part *McDonnell Douglas* burden-shifting framework as follows:

> If the employee can establish a prima facie case of discrimination, a rebuttable presumption of discrimination arises, which can alone sustain a discrimination claim. But the employer can defeat this presumption merely by producing evidence of a legitimate, nondiscriminatory reason for the disputed employment action. Once rebutted, the presumption disappears, and an employee lacking direct evidence cannot prove a statutory violation without evidence that the employer's stated reason is false and a pretext for discrimination. In

---

[6] The TCHRA was "modeled after federal civil rights law" and of its express purposes is to provide for the execution of the policies of Title VII. *NME Hosps., Inc. v. Rennels*, 994 S.W.2d 142, 144 (Tex. 1999). The TCHRA "purports to correlate 'state law with federal law in the area of discrimination in employment," so Texas courts "look to analogous federal precedent for guidance when interpreting" the TCHRA. *Id.* (citations and internal quotation marks omitted).

both direct- and circumstantial-evidence cases, the burden of persuasion remains at all times with the employee.

*Alamo*, 544 S.W.3d at 782 (footnotes omitted); *see also Flores*, 612 S.W.3d at 305.

### III. Exhaustion of Administrative Remedies

Appellee first argues that Holloway failed to exhaust his administrative remedies for all jobs except the two Senior Network Engineer positions. "A plaintiff must comply with administrative prerequisites to sustain an employment discrimination cause of action. This is mandatory and jurisdictional." *Bartosh v. Sam Houston State Univ.*, 259 S.W.3d 317, 321 (Tex. App.—Texarkana 2008, pet. denied). Indeed, the failure to timely file an administrative complaint under section 21.201 of the Texas Labor Code deprives a court of subject matter jurisdiction over discrimination claims. *Brownsville Indep. Sch. Dist. v. Alex*, 408 S.W.3d 670, 673 (Tex. App.—Corpus Christi 2013, no pet.); *see also Tex. Dep't of Transp. v. Esters*, 343 S.W.3d 226, 231 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (citing *Lueck v. State*, 325 S.W.3d 752, 757–65 (Tex. App.—Austin 2010, pet. denied)); *Bartosh*, 259 S.W.3d at 321 ("To attach jurisdiction, [plaintiff] must have filed a complaint with the Texas Commission on Human Rights or the United States Equal Employment Opportunity Commission (EEOC) within 180 days of the alleged discriminatory employment practice.") (footnote omitted). Section 21.201 provides in part:

> (a) A person claiming to be aggrieved by an unlawful employment practice or the person's agent may file a complaint with the commission.

–28–

(b) The complaint must be in writing and made under oath.

(c) The complaint must state:

(1) that an unlawful employment practice has been committed;

(2) the facts on which the complaint is based, including the date, place, and circumstances of the alleged unlawful employment practice; and

(3) facts sufficient to enable the commission to identify the respondent.

TEX. LAB. CODE § 21.201(a)-(c).

In this case, Holloway filed three EEOC charges. The first was on March 9, 2013, alleging he was "denied reemployment by [Parkland], unlike other three white male contract employees of [Parkland] jointly employed by [Parkland] and Xerox Corporation and then employed by [Parkland] in 2013." The second was filed on June 18, 2013, alleging the following "retaliatory conduct" by Parkland: "a disciplinary action against [him]" in April 2013; and, in late March and early April 2013, "false criticism of [his] projects and tasks." The third was filed on September 12, 2013, alleging Holloway's Xerox and Parkland joint employment was terminated "after I filed charges of race discrimination and retaliation against both of them." The following chart summarizes the relevant positions:

| Job Opening; Title | Time Frame When Job Filled or Posting Canceled | Individual Hired? | Race & Gender of Individual Hired, If Any | Holloway Exhausted Administrative Remedies for Discriminatory Failure to Hire Claim? | Relevant EEOC Charge |
|---|---|---|---|---|---|
| 133462; Senior Network Engineer | December 5, 2012 | Yes, Bob Black | Caucasian male | Yes (undisputed) | March 9, 2013 |
| 133607; Senior Network Engineer | December 5, 2012 | Yes, Lee Newman | Caucasian male | Yes (undisputed) | March 9, 2013 |

–29–

| | | | | | |
|---|---|---|---|---|---|
| 134578; Applications System Analyst/Programmer—Intermediate | May 13, 2013 | Yes, Christopher Harris | African American male | No | — |
| 135301; Applications System Analyst/Programmer—Senior | May 28, 2013 | No, Posting Canceled | — | No | — |
| 133822; Senior Systems Engineer | June 12, 2013 | Yes, Faisal Mossedeque | Asian male | No | — |
| 134799; Materials Information Systems Electronic Data Interchange Coordinator | September 5, 2013 | No, Posting Canceled | — | No | — |
| 135544; Senior Systems Engineer | September 24, 2013 | Yes, Kacey Harlan | White female | No | — |
| 135849; Systems Engineer | November 25, 2013 | No, Posting Canceled | — | — | — |
| 135087; Applications System Analyst/Programmer-Senior | January 10, 2014 | Yes, Alexander Townes | White male | No | — |
| 139028; Applications System Analyst/Programmer-Intermediate | April 2, 2014 | Yes, Brian Carswell | White male | No | — |

Parkland does not dispute that the "white male contract employees of [Parkland] . . . employed by [Parkland] . . . in 2013," in Holloway's March 9, 2013 EEOC charge can reasonably be interpreted to refer to the two Senior Network Engineer positions filled by Bob Black and Lee Newman, respectively. But Parkland maintains that Holloway's discriminatory failure to hire claims for the other positions could not have been included in his March 9, 2013 charge because they were filled or closed after that date, and we agree. Furthermore, Parkland argues that Holloway's second and third EEOC charges contain no factual

–30–

allegations that could reasonably support a discriminatory failure to hire claim on any position. Again, we agree.

Holloway, however, cites *Gupta v. E. Tex. State Univ.*, 654 F.2d 411 (5th Cir. 1981) for the proposition that his discriminatory failure to hire claims occurring after his March 9, 2013 EEOC charge are actionable as retaliation claims arising out of an earlier charge. *Id.* at 415 ("[I]t is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge; the district court has ancillary jurisdiction to hear such a claim when it grows out of an administrative charge that is properly before the court."). "The *Gupta* exception allows a plaintiff to proceed in district court on an unexhausted retaliation claim if that claim is alleging retaliation for properly bringing an exhausted claim before the district court." *Sapp v. Potter*, 413 F.App'x 750, 752 (5th Cir. 2011) (per curiam).

But *Gupta* waives the exhaustion requirement only for *retaliation* claims, not discrimination claims that were not included in any charge, as is the case here. *See Gupta*, 654 F.2d at 414. In *Gupta*, the court noted that "[i]t is the nature of retaliation claims that they arise after the filing of the EEOC charge." *Id.* The court added that "[r]equiring prior resort to the EEOC would mean that two charges would have to be filed in a retaliation case," and this would constitute "a double filing that would serve no purpose except to create additional procedural technicalities when a single filing would comply with the intent of Title VII." *Id.* Also, the Fifth Circuit has

clarified in post-*Gupta* opinions that the *Gupta* exception does not apply when an employer's action is claimed to have resulted *both* from discrimination and retaliation. *E.g.*, *Phillips v. Caris Life Sci. Inc.*, 715 F.App'x 365, 370 (5th Cir. 2017) ("[T]his court has repeatedly held that the *Gupta* exception only applies when the new claim is one of retaliation; *Gupta* does not apply to cases in which both retaliation and discrimination claims are alleged."); *Simmons-Myers v. Caesars Entm't Corp.*, 515 F.App'x. 269, 273 (5th Cir. 2013) (*Gupta* created an "exception for a claim involving only retaliation 'growing out of an earlier charge,' not a retaliation and discrimination claim simultaneously alleged."); *Sapp*, 413 F. App'x at 752–53 (5th Cir. 2011) (per curiam) ("Because the *Gupta* exception is premised on avoiding procedural technicalities, it has only been applied to retaliation claims alone.").

In this case, Holloway pleaded only a *discriminatory* failure to hire claim. As he alleged in his second amended petition, "Parkland discriminated against Plaintiff based on his race by selecting non-African American males to fill job positions that Plaintiff was more than qualified to fill, including but not limited to hiring two white network engineers over Plaintiff in December 2012." Thus, the rationale of *Gupta*— avoiding the filing of a second EEOC charge for a retaliation claim growing out of an earlier charge—does not apply to Holloway's post-March 9, 2013 failure to hire claims. *See Gupta*, 654 F.2d at 414; *Simmons-Myers*, F.App'x at 273–74; *see also Brownsville Indep. Sch. Dist. v. Alex*, 408 S.W.3d 670, 675 (Tex. App.—Corpus

Christi-Edinburg, no pet.) (rejecting plaintiff's argument that his EEOC charge alleging he was rejected for employment in "early October 2009" exhausted his administrative remedies as to other, unnamed positions for which he later applied). Furthermore, Texas courts have similarly rejected the application of the *Gupta* exception to concurrent retaliation and discrimination claims. *See Sw. Convenience Stores, LLC v. Mora*, 560 S.W.3d 392, 407 (Tex. App.—El Paso 2018, no pet.) ("Once Mora's petition claimed the termination resulted from both retaliation and the sexual harassment, the *Gupta* exception no longer applies."); *Wernert v. City of Dublin*, 557 S.W.3d 868, 876 (Tex. App.—Eastland 2018, no pet.) (*Gupta* exception does not apply when the plaintiff asserts claims for both retaliation and discrimination.). Additionally, were we to construe Holloway's allegations to concurrently allege both a discriminatory and a retaliatory failure to hire claim, his argument would still fail because, as we noted before, the *Gupta* exception does not apply to concurrent claims of discrimination and retaliation.

We conclude, therefore, that Holloway's discriminatory failure to hire claims occurring after his March 9, 2013 EEOC charge, for which he did not exhaust his administrative remedies, were properly dismissed. This leaves the two Senior Network Engineer positions (jobs 133462 and 133607), issues to which we now turn our attention.

### IV. Discriminatory Failure to Hire

To establish a prima facie case of discrimination due to an employer's failure

to hire, the employee must show (1) he is a member of a protected class; (2) he sought and was qualified for an available employment position (or, alternatively, that his application would have been a futile gesture); (3) despite his qualifications, he was not selected for the position; and (4) the employer selected someone not in the employee's protected class or continued to seek applicants with the employee's qualifications. *Dallas Indep. Sch. Dist. v. Allen*, No. 05-16-00537-CV, 2016 WL 7405781, at *9, n.11 (Tex. App.—Dallas Dec. 22, 2016, pet. denied) (mem. op.) (reversing trial court's order denying defendant's plea to the jurisdiction on plaintiff's discrimination claim); *see also Shackleford v. DeLoitte & Touche, LLP*, 190 F.3d 398, 406 (5th Cir. 1999) (analyzing both Title VII and Texas Labor Code claims and noting in part that "Shackelford's failure to apply for the position does not bar her claim if she can show that such an application would have been a futile gesture"). To demonstrate the futility of an application, Holloway must show he "was deterred by a known and consistently enforced policy of discrimination." *Shackleford*, 190 F.3d at 406.

Holloway did not apply for the either of the two Senior Network Engineer positions. And although he may overcome this failure by showing "that such an application would have been a futile gesture," he fails to show he "was deterred by a known and consistently enforced policy of discrimination." *Jenkins v. Louisiana Workforce Comm'n*, 713 F.App'x. 242, 245 (5th Cir. 2017) (citing *Shackleford*, 190 F.3d at 406). Parkland's evidence shows that recruiter Williams, an African

American female who did not know Holloway, controlled which resumes were forwarded to the hiring manager, Saine, for review. The two positions remained posted for approximately 44 days and 34 days, respectively, more than the seven days required by Parkland policy. The evidence further shows Parkland followed its posting, interview, and hiring policies in the hiring of Newman and Black, and that Holloway never contacted anyone at Parkland about applying for the positions, which remained open for weeks after Black and Newman applied. Holloway responds by citing his deposition testimony that Black, a former Xerox Network Engineer who was ultimately hired for one of the two Senior Network Engineer positions, told Holloway that Saine told Black about the posting of the Senior Network Engineer positions. Yet even if we assume this testimony is admissible (and we do not so conclude), it does not show Holloway's application would have been futile, which, in any event, is negated by Holloway's admission that he did not contact anyone at Parkland or attempt to apply for the positions, and which remained open after Black and Newman applied.

Holloway also cannot show he was qualified for the Senior Network Engineer positions because they required a CCNA certification as a minimum requirement—a certification held by Black and Newman, but not Holloway. Holloway argues that his long tenure at Parkland shows he was as well qualified for the positions as Black and Newman, but an applicant's longer tenure does not demonstrate qualification. *See Nichols v. Lewis Grocer*, 138 F.3d 563, 568–69 (5th Cir. 1998).

Because Holloway did not apply either of the two Senior Network Engineer positions and he fails to show his application would have been futile, he cannot establish a prima facie case for discriminatory failure to hire.

Furthermore, even if Holloway could establish a prima facie case, his lack of a CCNA certification constituted a legitimate, non-discriminatory reason for not routing his resume to the hiring managers for consideration. *E.g.*, *Little v. Tex. Dep't of Crim. Just.*, 177 S.W.3d 624, 631 (Tex. App.—Houston [1st Dist.] 2005, no pet.) ("Selecting a more qualified applicant generally constitutes a legitimate, nondiscriminatory justification for a failure to hire an applicant."). Holloway had two methods available to him to prove Parkland's proffered reason for not hiring him was a pretext for racial discrimination: (1) Parkland's reason for not promoting him was false or "unworthy of credence," or (2) he was "clearly better qualified" than the persons selected for the positions. *Sw. Bell Tel., L.P. v. Edwards*, No. 05-09-00606-CV, 2011 WL 3672288 at *11–12 (Tex. App.—Dallas, Aug. 23, 2011, no pet.) (mem. op.) (citing *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 412 (5th Cir. 2007)). Holloway pursues the first option. As this Court has noted, "[a]n employer's explanation is false or unworthy of credence if it is not the real reason for the employment action." *Id.* at *5.

Holloway's pretext argument is centered on alleged racial animus against him by Greenslade and hiring manager Saine. But this argument overlooks the fact that Saine, according to the evidence, could only select for hire those candidates

forwarded to him for consideration by Gillian Williams (who is African American), and Greenslade was not a hiring manager for any actionable position at issue in this litigation. Holloway argues that even before the two senior network engineer positions were publicly posted or Parkland received any applications or resumes, "Greenslade and Saine had already decided Parkland would hire two white Xerox employees—Bob Black and Lee Newman," and that "Greenslade and Saine had also already decided *against* hiring Holloway." In his deposition, however, Saine insisted it was not a "foregone conclusion" that Black and Newman would be hired to work with him at the new Parkland Hospital, but he and Greenslade identified them as people "we'd like to interview." And, furthermore, even if Saine showed favoritism towards Black and Newman (which Parkland denies), Holloway fails to demonstrate that the favoritism was because Black and Newman were white candidates. Holloway believed Saine wanted to hire Newman because they were friends, but this does not demonstrate that Saine had a policy of hiring white candidates

Holloway also cites the affidavit of Joe Juarez, who worked on Parkland's IT account for approximately 19 years—both in-house and outsourced. Juarez testified that based on his experience as a network engineer, a CCNA certification was "a good starting point, but it was not a substitute for real-world experience." It was "also not an indicator of the level of a network engineer's technical knowledge or skill." Juarez had held a CCNA, and he stated that at the time he worked "with other

network engineers, including Mark Holloway, who did not have CCNAs, but who had more technical knowledge and skill within the network environment than I did." In March of 2013, Juarez requested Holloway "get involved in helping us" with a technical problem involving "VPN tunnels." Juarez stated that after he was rehired by Parkland in 2009, he "continued to interact with [Holloway] at Parkland in the IT department . . . until [Holloway] was terminated in 2013," and during this time Holloway "appeared to demonstrate a high level of technical knowledge about the Cisco network environment he worked in." Holloway argues this evidence raised a fact issue as to whether the CCNA requirement was itself a pretext. Parkland, however, argues that Juarez's testimony is speculative regarding Holloway's qualifications in 2012 and 2013 because Juarez, who had not managed Holloway since 2009, lacked sufficient contact with him during the relevant period to have personal knowledge of Holloway's technical skills or work performance during the years at issue in this litigation.

We need not resolve this issue because even if we assume Juarez's testimony was admissible, it demonstrated, at most, that Holloway had equivalent qualifications to Newman, who was a CCNA certified engineer, yet still lesser qualifications than Black, who also held a CCNP—a more advanced certification. Based on this record, Juarez's opinion about the usefulness of the CCNA requirement as a minimum qualification is insufficient to defeat Parkland's plea to the jurisdiction. *See Allen*, 2016 WL 7405781, at *9, n.11.

–38–

We reach a similar conclusion regarding the use of non-actionable positions such as the selection of Kasey Harlan for job number 135544, or Alexander Townes for job 135087, to demonstrate pretext. Parkland articulated legitimate, non-discriminatory reasons for hiring other candidates for each position. For example, Harlan, the successful applicant for job number 135544, had Sharepoint server experience, which Holloway lacked (according to his resume). Also, the successful applicant for job number 135087 could design applications, and Holloway's resume showed no such skill. Regarding job number 139028, the position ultimately filled by Brian Carswell, the evidence showed Carswell had "correctional facility experience" and was already working for Parkland at the jail—experience Holloway lacked. Other positions referenced by Holloway, e.g., jobs 134799, 135301, and 135849, were canceled. Parkland's explanation that these positions were not filled constituted a legitimate, nondiscriminatory reason for its failure to hire Holloway. These alleged examples of pretext fail to raise a genuine issue of material fact, either when considered independently or cumulatively. *See Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 325 (5th Cir. 2002) (upholding summary judgment on a failure to hire claim because employer's explanation that the position was not filled was a legitimate, nondiscriminatory explanation for its failure to hire the plaintiff); *see also E.E.O.C. v. Tex. Instruments*, 100 F.3d 1173, 1186–87 (5th Cir. 1996) ("'Evidence' that does not imply pretext taken alone does not do so when cumulated.").

Accordingly, the trial court did not err in dismissing Holloway's remaining claims for discriminatory failure to hire.

## V. Retaliatory Termination

To make a prima facie case for race discrimination, Holloway must establish he was (1) a member of a protected class, (2) qualified for his position, (3) subjected to an adverse employment action, and (4) treated less favorably than similarly situated individuals outside of his protected class. *See McCoy v. Tex. Instruments, Inc.*, 183 S.W.3d 548, 554 (Tex. App.—Dallas 2006, no pet.). The TCHRA prohibits an employer from retaliating against an employee who opposes such discrimination. TEX. LAB. CODE § 21.055. Retaliation claims can be actionable under the TCHRA even if the underlying discrimination claim is not. *Alamo Heights*, 544 S.W.3d at 781. To establish a prima facie retaliation case under the TCHRA, a plaintiff must show (1) he engaged in a protected activity, (2) the employer took an adverse employment action against him, and (3) a causal connection between the protected activity and the adverse employment action. *Alamo Heights*, 544 S.W.3d at 782; *San Antonio Water Sys. v. Nicholas*, 461 S.W.3d 131, 137 (Tex. 2015); *see also Limas v. City of Dallas*, No. 05-19-01223-CV, 2021 WL 3197334, at *13 (Tex. App.—Dallas July 28, 2021, no pet.) (mem. op.); *City of Dallas v. Siaw-Afriyie*, No. 05-19-00244-CV, 2020 WL 5834335, at *6 (Tex. App.—Dallas Oct. 1, 2020, no pet.) (mem. op). Circumstantial evidence of retaliation to show a causal link may include: (1) the employer's failure to follow its usual policy

and procedures in carrying out the challenged employment actions; (2) discriminatory treatment in comparison to similarly situated employees; (3) knowledge of the discrimination charge or suit by those making the adverse employment decision; (4) evidence the stated reason for the adverse employment decision was false; and (5) the temporal proximity between the employee's conduct and discharge. *Crutcher v. Dallas Indep. Sch. Dist.*, 410 S.W.3d 487, 494 (Tex. App.—Dallas 2013, no pet.). "The employee need not establish the protected activity was the sole cause of the employment action." *Siaw-Afriyie*, 2020 WL 5834335, at *6. "All that is required is evidence from which a factfinder may infer that retaliation motivated the adverse employment action in whole or in part." *Id*.

In *Alamo Heights*, the Texas Supreme Court declined to specify the causation standard under which TCHRA retaliation claims are evaluated. 544 S.W.3d at 782–83. Acknowledging it "[had] yet to determine the appropriate causation standard for a TCHRA retaliation claim," the supreme court applied the but-for standard rather than the mixed-motives standard "because the parties have advocated the but-for standard and have not asserted any other should apply." *Id*. The *Alamo Heights* court noted that "[t]he causation standard for the *McDonnell Douglas* prima-facie-case element is not onerous and can be satisfied merely by proving close timing between the protected activity and the adverse action." *Id*. at 782. But the court added that "[t]he but-for causation standard is significantly more difficult to prove than prima facie causation." *Id*. Prior to *Alamo Heights*, this Court required the

plaintiff to establish a "but for" causal nexus between the protected activity and the adverse employment action to satisfy the causation element of a retaliation claim. *Crutcher*, 410 S.W.3d at 494. Thus, until the supreme court rules otherwise, we follow our precedent and evaluate appellant's TCHRA retaliation claim under a but-for causation standard. *See Siaw-Afriyie*, 2020 WL 5834335, at *6.

Holloway acknowledges he was an employee of Xerox and not Parkland. Therefore, he can only impose liability on Parkland for the termination of his Xerox employment under the Texas Labor Code based on an indirect employer theory. *NME Hosp. Inc. v. Rennels*, 994 S.W.2d 142, 146–47 (Tex. 1999) (adopting indirect employment theory of liability announced in *Sibley Mem. Hosp. v. Wilson*, 488 F.2d 1138 (D.C. Cir. 1973)). In *Rennels*, the Texas Supreme Court held that a direct employment relationship is not required if the plaintiff can show an employer used its position of power and control, adversely and wrongfully, to interfere with the plaintiff's employment relationship with a third party. *Rennels*, 994 S.W. 2d at 147; *see also Sibley Mem'l Hosp. v. Wilson*, 488 F.2d 1338, 1341–43 (D.C. Cir. 1973). To state such a claim, the plaintiff must show (1) the defendant is an employer within the statutory definition; (2) an employment relationship exists between the plaintiff and a third party; and (3) the defendant controlled access to the plaintiff's employment opportunities and denied or interfered with that access based on unlawful criteria. *Rennels*, 994 S.W.2d at 147; *see also Texas Tech Univ. Health*

*Scis. Ctr. v. Martinez*, No. 07-22-00055-CV, 2022 WL 3449495, at *1 (Tex. App.—Amarillo Aug. 17, 2022, no pet.) (mem. op.).

Holloway alleges the following discriminatory and retaliatory actions by Parkland that allegedly affected his Xerox employment: (1) requesting that Xerox discipline him; (2) requesting that Xerox remove him from the Parkland account; (3) requesting that Xerox terminate his Xerox employment. Parkland, in turn, offered evidence that (1) it had no control over Xerox's promotion, compensation, discipline, or termination of Holloway; (2) it did not control Holloway's eligibility to be assigned to another Xerox account; and (3) it did not request Holloway's discipline or removal from the Parkland account, or his termination from Xerox.

Parkland argues its customer complaints to Xerox—in response to Holloway's alleged performance deficiencies—did not equate to interference with Holloway's employment. In response, Holloway offers evidence of Greenslade's ability to cancel the Parkland contract with Xerox and his request that Xerox network engineers be removed from the Parkland account. Yet this only indicates control over *how* Xerox performed its contract with Parkland, not operational control over Xerox itself, as required by *Rennels*. *Cf. Rennels*, 994 S.W.3d at 147 (noting plaintiff Rennels had shown the defendant hospital was in a position to interfere with her employment relationship with third party, Sierra; contracts between hospital and Sierra specifically gave hospital "control over certain employment issues"); *Univ. of Texas-Pan Am. v. Miller*, No. 03-10-00710-CV, 2013 WL 4818355, at *5 (Tex.

–43–

App.—Austin Aug. 28, 2013, no pet.) (mem. op.) (*Rennels* standing applied because the defendant controlled the plaintiff's ability to be commissioned as a peace officer, a minimum qualification for his position with his direct employer). Moreover, the evidence shows that complaints from Holloway's Xerox co-worker, Jamie Fletcher, about Holloway are what prompted Clark to remove Holloway from the site, according to Clark's deposition testimony. Clark also testified that the complaints he received about Holloway's attitude were not coming just from Fletcher; they were coming from other Xerox employees. In addition, Holloway was still employed by Xerox and eligible for reassignment after Parkland's complaints about his work performance to Xerox, and he did not seek reassignment to a different Xerox client. *See Mayes v. Kelly Servs., Inc.*, No. 4:03-CV-091-A, 2004 WL 533951, at *3 (N.D. Tex. Feb. 11, 2004), *aff'd*, 108 F. App'x 932 (5th Cir. 2004) ("When plaintiff's assignment with Onstar ended, he still had an opportunity to request Kelly to assign him to a different workplace. Thus, Onstar did not interfere with plaintiff's employment relationship with Kelly."). Therefore, we conclude Holloway cannot establish that Parkland asserted the type of control found in *Rennels* and its progeny to be sufficient to invoke indirect employer liability.

Furthermore, were we to conclude Parkland exercised sufficient control over Holloway's employment opportunities under *Rennels*, he has not established a prima facie case of retaliatory termination. Holloway claims he engaged in protected activity when he (1) participated in the December 2012 Parkland police investigation

–44–

and complained of Parkland's racially discriminatory hiring practices; (2) filed a March 9, 2013 charge of discrimination against Parkland; (3) filed a second charge of discrimination against Parkland on June 18, 2013; (4) participated in an interview with an investigator hired by Parkland to investigate complaints of race discrimination in the IT Division (the interview took place on June 18 to 19, 2013); and (5) filed a third charge of discrimination against Parkland on September 12, 2013. Parkland does not dispute that these actions constitute protected activities.

It argues, however, that Holloway conflates Parkland's complaints to Xerox about his performance (which, Parkland maintains, are not adverse employment actions), with Xerox's decision to remove Holloway from the Parkland account and, subsequently, terminate his Xerox employment. Holloway cites *University of Texas Southwestern Medical Center v. Vitetta* as support for his argument that he suffered an adverse employment action, arguing that "[b]y [criticizing] Holloway's performance unjustly to Xerox, instigating his PIR, and imposing the CCNA requirement, and removing Holloway from the campus and its account, Parkland changed the terms, conditions and privileges of Holloway's employment, and it denied him and interfered with [his] employment opportunities at Xerox." *See* No. 05-19-00105-CV, 2020 WL 5757393 (Tex. App—Dallas Sept. 28, 2020, no pet.) (mem. op.).

In *Vitetta*, this Court held that denying a university professor funding, cutting her laboratory space, and firing her employees (because of her age and sex and in an

attempt to force her to retire) was actionable discrimination. *Id*. at \*16 ("At a minimum, a fact issue exists on whether her lab constituted a term, condition, or privilege of her employment and whether its removal was sufficiently adverse to constitute an adverse employment action for *McDonnell Douglas* purposes."). *Vitetta*, however, involved a direct employment relationship in which the plaintiff provided evidence that her employer's action in cutting her funding and staffing her research lab materially affected her employment. *See id*. at \*1, 16-17.

The situation here is different because Holloway was employed by Xerox, not Parkland. Unlike the plaintiff in *Vitetta*, Holloway cannot show Parkland's customer complaints directly caused any change in his Xerox employment. Additionally, Parkland made performance-related complaints to Xerox about Xerox network engineer Mercer, a white male who did not engage in any protected activity. Mercer was later removed from the Parkland account at Greenslade's request (according to McDonald's declaration), and his Xerox employment terminated. Holloway also argues that Xerox Network Engineer Fletcher, a white male, was not disciplined for causing an outage in 2013. Greenslade testified, however, that he did not complain to Xerox about Fletcher's performance or request that Xerox discipline him over the outage because he "took ownership of the mistake" and "worked diligently to resolve the issue as quickly as possible." Thus, Fletcher's outage was not of "comparable seriousness" to the Amelia Court outage discussed previously, where Holloway left the room, leaving Xerox's Fletcher and Parkland's McChesney to fix the problem.

–46–

*See AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 594 (Tex. 2008) (to prove discrimination based on disparate discipline, misconduct of both disciplined and undisciplined employees "must be of 'comparable seriousness.'") (internal citation omitted).

Holloway's retaliation claim also fails because he cannot establish "but-for" causation between Parkland's customer complaints and the termination of his Xerox employment. Holloway's supervisor at Xerox, John Clark, had the authority to decide to remove Holloway from the Parkland account, and ultimately did so. And Clark testified that (1) Parkland did not request Holloway's removal; (2) regardless of whether anyone at Parkland asked Brian McDonald to remove Holloway from the Parkland account, Clark already knew it needed to be done because he was not providing CCNA or equivalent service to Parkland, and because Holloway was not meeting performance improvement goals; (3) complaints from Holloway's Xerox co-worker, Jamie Fletcher, and from other Xerox employees, are what prompted Clark to remove Holloway from the Parkland account.

Holloway, however, testified that on the morning of August 31, 2013, the day he was asked to leave the Parkland campus, he showed up for work at Parkland and, over the telephone, Clark told him Parkland wanted him off their account and to leave the site. Holloway also cites Clark's deposition testimony where he was asked about his prior testimony from 2016, during an arbitration proceeding. Clark was asked what he told Holloway regarding why he had to leave, and Clark told him the

–47–

client indicated he had to leave.

Parkland argues that Clark's arbitration testimony is not competent summary judgment evidence. We need not resolve this issue, however, because Clark's prior testimony, even if admissible, does not controvert the other reasons he offered for removing Holloway from the Parkland account. Moreover, it is undisputed that Holloway was still employed by Xerox and eligible for reassignment at the time of his removal from the Parkland account.

Holloway also argues that Greenslade, the Parkland decision-maker, had knowledge of Holloway's protected activity. *E.g., Univ. of Tex. Southwestern Med. Ctr. v. Saunders*, 2016 WL 3854231, at * 4–6 (Tex. App.—Dallas July 13, 2016, no pet. denied) (mem. op.) (reversing trial court's denial of plea to the jurisdiction because there was no causal link between employee's disability discrimination lawsuit and termination of her employment where the decision maker had no knowledge of lawsuit); *Crutcher v. Dallas Indep. Sch. Dist.*, 410 S.W.3d 487, 496 (Tex. App.—Dallas 2013, no pet.) ("On this record, the summary judgment evidence concerning DISD's knowledge of the 2004 Lawsuit does not establish the casual connection required to prove a prima facie case of retaliation."); *Higgs v. Trammell Crow Co.*, 05-04-00547-CV, 2005 WL 317791, at *2–3 (Tex. App.—Dallas Feb. 10, 2005, no pet.) (mem. op.) (evidence established that Castor, the decision maker in that case, had no knowledge at the time of his decision not to hire Higgs that Higgs had filed a charge with the EEOC). But Parkland offered evidence that Greenslade

was unaware of Holloway's participation in the December 2012 Parkland Police investigation and Holloway's EEOC charges until after Holloway's removal from the Parkland account. Parkland also offered evidence that although Greenslade was interviewed by Parkland's independent investigator, Marie Watts, in May and July of 2013, he did not understand that Holloway had taken legal action against Parkland. Holloway maintains that Greenslade had knowledge of his protected activity because Parkland's Director of Employment Experience, Kurt Delabar, allegedly shared "significant portions of the Parkland police department's investigation" with Greenslade. In fact, however, the information Delabar shared with Greenslade was a complaint from Valerie O'Keeffe-Short—a female employee of Parkland—against Greenslade. There is no evidence Delabar shared *Holloway's* complaints in the police investigation with Greenslade. Thus, Holloway's evidence does not controvert Greenslade's testimony that he lacked knowledge of Holloway's protected activity.

The temporal proximity in this case is likewise insufficient to defeat summary judgment. There were performance deficiencies involving Holloway dating back to 2011, about which Parkland complained prior to the December 2012 Parkland police investigation. Furthermore, Parkland already had insisted—and Xerox had informed Holloway—that he must obtain a CCNA prior to December 2012. In addition, Parkland's conversations with Xerox about Holloway's performance issues and his lack of a CCNA continued throughout the period between December 2012, and after

–49–

the June 18, 2013 EEOC charge. Following this protected activity, Holloway had two more performance issues (the Medlock incident on July 11, 2013; the Amelia Court incident on July 24), which motivated additional complaints by Parkland. But the fact that Holloway's June 18, 2013 EEOC charge was filed approximately two months before his removal from Parkland in August 2013 is not evidence his June 18 protected activity—or any of his previous protected activity—caused Parkland's last complaints to Xerox because the grounds for those complaints by Parkland arose *after* the protected activity. Thus, the temporal proximity in this case is insufficient to defeat summary judgment. *See Green v. Lowe's Home Centers, Inc.*, 199 S.W.3d 514, 523 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (temporal proximity between plaintiff's protected activity and his termination did not raise a fact issue as to a causal link when the stated grounds for termination occurred after the protected activity). In addition, regardless of the duration between Holloway's protected activities and Parkland's complaints to Xerox, temporal proximity alone cannot support a causal connection because Parkland's decision-maker, Greenslade, did not have knowledge of Holloway's protected activity. *See Crutcher*, 410 S.W.3d at 496 ("Temporal proximity may be evidence of a causal connection only when a person with input into the employment decision was aware of the protected activity.").

We therefore conclude the trial court did not err in dismissing Holloway's claim for retaliatory termination.

## VI. Conclusion

Holloway cannot meet the *McDonnell Douglas* burden on his retaliatory termination claim, and Holloway's discriminatory failure to hire claim likewise fails for the above reasons. We therefore overrule Holloway's issue and affirm the trial court's order granting Parkland's plea to the jurisdiction and motions for summary judgment.

201114f.p05

/Lana Myers//

LANA MYERS
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MARK HOLLOWAY, Appellant

No. 05-20-01114-CV          V.

DALLAS COUNTY HOSPITAL
DISTRICT D/B/A PARKLAND
HEALTH AND HOSPITAL
SYSTEM, Appellee

On Appeal from the 44th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-14-00792.
Opinion delivered by Justice Myers.
Justice Nowell participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**. It is **ORDERED** that appellee DALLAS COUNTY HOSPITAL DISTRICT D/B/A PARKLAND HEALTH AND HOSPITAL SYSTEM recover its costs of this appeal from appellant MARK HOLLOWAY.

Judgment entered this 23rd day of December, 2022.